FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

Argia Riggs                                    :

                    Plaintiff,        :        Hon. Joseph H. Rodriguez

        v.                             :        Civil Action No. 11-3455

Metropolitan Life Insurance Company,  :        **OPINION**

                    Defendant.        :
_____

Appearances:

*Attorney for Plaintiff*:
Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose & Podolsky, PC
Eastgate Corporate Center
308 Harper Drive, Suite 200
Moorestown, NJ 08057

*Attorney for Defendant*:
Randi F. Knepper, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLC
100 Mulberry Street
Newark, NJ 07102

        **RODRIGUEZ**, Senior District Judge:

        This case concerns the tragic death of Mr. Terry Riggs.  Plaintiff Argia Riggs, Mr.

Riggs' wife, brought this suit pursuant to the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001, et. seq., challenging Defendant Metropolitan Life

Insurance Company's ("MetLife") denial of her application for optional life insurance

benefits following the death of her husband based on the insurance policy's "suicide

clause."  Before the Court are the parties' Cross-Motions for Summary Judgment [Dkts.

11, 15].  Ms. Riggs argues that the Court should grant summary judgment in her favor

1

and reverse MetLife's decision because the claim administrator abused her discretion when applying the "suicide clause," as Mr. Riggs' death was not a "suicide" under the meaning of the insurance policy.  MetLife argues that the Court should grant summary judgment in its favor and uphold the claim administrator's decision because the claim administrator did not abuse her discretion in denying the claim.

The Court considered the parties' initial submissions and, on June 20, 2012, dismissed without prejudice the parties' Cross-Motions and gave the parties leave for simultaneous briefing on the definition of "suicide."  The Court has considered the arguments presented by the parties' supplemental submissions as well as those advanced during oral argument on December 12, 2012.  For the reasons stated below, the Court must deny Ms. Riggs' Motion for Summary Judgment [Dkt. 11] and grant MetLife's Cross-Motion for Summary Judgment [Dkt. 15].

## I.      Jurisdiction

This Court has subject matter jurisdiction over this ERISA action pursuant to 28 U.S.C. § 1331.  Venue is proper in this Court under 28 U.S.C. § 1391(b).

## II.     Factual and Procedural History

The facts presented herein are based on the undisputed administrative record[1] attached as Exhibit A to Ms. Riggs' Motion for Summary Judgment, which includes:  the

---

[1] The entire administrative record was submitted in support of Ms. Riggs' Motion for Summary Judgment, attached thereto as "Exhibit A."  Throughout this opinion, the administrative record will be noted as "ML XXXX."  Additionally, MetLife argues that the Court should disregard the Psychological Autopsy, submitted by Ms. Riggs as "Exhibit B" to her Motion.  The Psychological Autopsy is a tool prepared by Dr. Maris which includes 122 questions which, in this case, were completed by Ms. Riggs.  (Pl.'s Mot. 4)  Dr. Maris indicated that he relied upon the Psychological Autopsy in writing his report; however, the Psychological Autopsy was not submitted to MetLife during the appeal and is therefore not included in the administrative record before the Court.

NuStar Life Insurance Plan (ML 0001-0058); several Life Insurance Claim Forms and related documents, including the denial letters and copies of Mr. Riggs' Certificate of Death (ML 0059-0093); Dr. Ronald Maris' curriculum vitae (ML 0096-0134) and report (ML 0135-0155); Notes from Mr. Riggs' treating physician (ML 0156-0160); MetLife's Senior Referral Form used in Ms. Riggs' appeal of her benefits denial (ML 0161-0163); a letter from MetLife's Senior Claim Examiner, Group Life Claims Options, addressed to Ms. Riggs' attorney responding to her attorney's request for review of the denial of the claim (ML 0164-0165), and a form notifying an Account Manager that Ms. Riggs' claim was denied (ML 0166).

The events prior to Mr. Riggs' death are as follows. Dr. Maris' report indicates that for few years prior to 1991, Mr. Riggs took Zoloft, an antidepressant. (ML 0137) On November 17, 2009, Dr. John Wilkes, M.D., gave Mr. Riggs Abilify, an antipsychotic. (ML 0137) Because Abilify made Mr. Riggs feel "too lethargic," on March 9, 2010, Mr. Riggs was prescribed Zyprexa, an antipsychotic. (ML 0160; ML 0137) After taking Zyprexa for three days, he told Ms. Riggs that he heard "uncontrollable thoughts and voices" and "it made him feel like killing himself." (ML 0137) On Monday, March 15, 2010, Mr. Riggs called his physician, who prescribed Cymbalta, an SNRI antidepressant, and was told to visit the ER if he continued to feel suicidal. (ML 0137) That evening, Mr. Riggs telephoned a family friend and told her that he had negative thoughts, could not concentrate, and "heard voices telling him to kill himself." (ML 0138)

---

The Third Circuit has noted that under the arbitrary and capricious standard, a reviewing court is to consider only the evidence that was before the administrator when she made the decision under review. See, e.g., Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012) (internal citations omitted). Accordingly, the Court's review in this instance is restricted to consideration of only the materials that were before the claim administrator when she denied Ms. Riggs' claim.

At approximately 5:30 a.m. during the morning of March 17, 2010, when Ms. Riggs was preparing to take a shower, she heard a "bang." (ML 0136) She returned to the master bedroom and found Mr. Riggs bleeding on the floor. (ML 0136; ML 0138) He shot himself in the head with a gun that he had kept under his bed for the previous 19 or more years. (ML 0137) Ms. Riggs called 911 and the emergency responders transported Mr. Riggs to Cooper Hospital in Camden, NJ, where he died approximately five hours later. (ML 0136-37) There was no toxicology report and his body was cremated. (ML 0137).

At the time of his death, Mr. Riggs worked as a maintenance mechanic for NuStar Gp, LLC ("NuStar") and participated in the NuStar life insurance plan ("the Plan"). (ML 0059-0072; ML 0138) The Plan is funded by a policy of group life insurance issued by MetLife to NuStar. (ML 001-0058) Following Mr. Riggs' death, NuStar submitted an Employer's Statement to MetLife, indicating the following: Mr. Riggs died on March 17, 2010; Mr. Riggs last worked on March 16, 2010; Mr. Riggs was eligible for basic life insurance in the amount of $5,000 effective April 1, 2008, and Mr. Riggs' base annual salary was $65, 166.40. (ML 0059-0060; ML 0068-0069) NuStar also submitted a Benefit Enrollment Confirmation form, which stated that Mr. Riggs was enrolled for four times his base benefit salary, or $261,000, in optional life insurance benefits. (ML 0073) Additionally, MetLife received a Beneficiary Designation form, indicating that Mr. Riggs' primary beneficiary was Ms. Riggs, who was eligible to receive 100% of the benefits. (ML 0061).

4

On May 15, 2010, Ms. Riggs applied to MetLife for life insurance benefits under the Plan.  (ML 0064-0066)  In a letter dated July 14, 2010, MetLife denied her claim for benefits.  (ML 0091)  MetLife explained that page 49 of the Plan states:

> Suicide
> If You commit suicide within 2 years from the date Life Insurance for You takes effect We will not pay such insurance and Our liability will be limited as follows:
>
> - any premium paid by You will be returned to the Beneficiary; and
> - any premium paid by the Policyholder will be returned to the Policyholder

(ML 0091)  MetLife explained that Mr. Riggs enrolled for Optional Life Insurance on April 1, 2008 and that the Certificate of Death issued by the State of New Jersey states that he died on March 17, 2010 as a result of "gunshot wound to head," that Mr. Riggs "shot self," and that the manner of death was "suicide."  (ML 0092)  Accordingly, MetLife stated that it denied the claim, as Mr. Riggs "died within 2 years of the effective date as a result of suicide."  (ML 0092).

By way of correspondence dated February 17, 2011, Ms. Riggs appealed MetLife's claim determination.  (ML 0095-0160)  To support her appeal, she submitted the following documents:  medical records from Mr. Riggs' psychiatrist; the thirty-eight page *curriculum vitae* of Dr. Ronald Maris, a board-certified forensic suicidologist; and a report issued by Dr. Maris that reviews Mr. Riggs' case.  (ML 0095-0160).

Dr. Maris' report indicated that "to be classified and certified as a 'suicide' requires both the intent and motivation to suicide," and that "it is well-known that antipsychotics (like Zyprexa and Abilify) and antidepressants (like Cymbalta and Zoloft) have side-effects that are associated with increased suicidality."  (ML 0138-0140)  Dr. Maris

opined that Mr. Riggs lacked both the intent and motivation to suicide.[3]  (ML 0138-0139)  Specifically, he opined that Mr. Riggs lacked the intent to suicide, as he "had a psychotic episode produced or made worse by his Zyprexa ingestion and simply followed his '*command hallucinations*' to kill himself." (ML 0139) (emphasis in original)  Accordingly, Dr. Maris concluded that Mr. Riggs "was incapable of forming suicide intent" and that he acted "compulsively and impulsively to comply with his drug-induced hallucinations."  (ML 0139).

Dr. Maris also concluded that Mr. Riggs lacked the motivation to suicide, which concerns "not <u>if</u> someone intended to suicide, but rather <u>why</u> they wanted to die," for example to escape from chronic mental or physical pain.  (ML 0139) (emphasis in original)  He noted that such motivation requires "the ability to reason and think clearly about the consequences of one's suicide."  (ML 0139)  In psychotic or drug-induced suicides, the action "is not intended to resolve anything, but rather is an automatic response or irresistible impulse generated by a neurobiological, pharmacological condition of altered consciousness, often involving (as in Terry Riggs' case) psychotic delusions of hallucinations."  (ML 0139).

Dr. Maris also opined that Mr. Riggs was "at a low risk to suicide" prior to taking Zyprexa and Cymbalta.  (ML 0146)  Specifically, he identified fifteen common risk factors, or "predictors," of suicide:

---

[3] Dr. Maris based his report on the following: (1) the Complaint, (2) Death Certificate, (3) West Deptford Township Police Incident Report; (4) Gloucester County Autopsy Report, and (5) Psychological Autopsy completed by Ms. Riggs, in addition to his "own education, training, experience, research, and publications."  (ML 0135).

(1) Depressive illness, mental disorder, affective disorder; (2) Alcoholism, drug or substance abuse; (3) Suicide ideation, talk, preparation; (4) Prior suicide attempts; (5) Lethal methods to attempt suicide (esp. firearms); (6) Isolation, living alone, loss of social support, rejection; (7) Hopelessness, cognitive rigidity; (8) Being an older white male; (9) Modeling, suicide in the family, genetics; (10) Work problems, unemployment, occupation; (11) Marital, sexual, dating problems, family pathology; (12) Stress, negative life events; (13) Anger, aggression, impulsivity, irritability, 5-HT Flux; (14) Physical Illness; (15) Repetition and co mobidity of factors 1-14, "suicidal careers."

(ML 0146)  Dr. Maris opined that Mr. Riggs "only had 5-6 of the 15 known suicide risk factors," which translates to "a 3-4 on a 10 point suicide risk scale or 'low to moderate' suicide risk."  (ML 0147)  An individual is more likely to suicide based on the number of risk factors associated with that individual.[4]  Dr. Maris noted that "[a]bsent an acute drug reaction, it is not likely that an individual with only 33 to 40% of the known suicide risk factors would suicide."  (ML 0147)  Here, Dr. Maris opined that the medications exacerbated risk factors 1, 3, and 13 in Mr. Riggs.  (ML 0147).

Dr. Maris stated that he was "not arguing that psychiatric medication was the one and only cause of Terry Riggs' suicide"; rather, he concluded that the medications induced or exacerbated some of Mr. Riggs' risk factors for suicide.[5]  (ML 0148)  Dr. Maris noted that Mr. Riggs "lived and coped with these other suicidogenic stressors without ever once attempting suicide" and that Terry became suicidal only after starting

---

[4] For example, Dr. Maris explained that novelist Ernest Hemingway, who committed suicide, had all 15 suicide risk factors.  (ML 0148).

[5] Dr. Maris noted that there can be more than one proximate cause of an effect like suicide and that to him, "proximate" means a "necessary condition" and not a "sufficient condition" or "the only cause."  (ML 0148)  Dr. Maris noted that suicide is typically "multifactorial and has many causes."  (ML 0148)  Here, Dr. Maris noted that "Zyprexa (and to a lesser extent, Cymbalta) was the 'pharmacological straw(s)' that broke Riggs' coping 'back,' except that the impact of Zyprexa in this case was more like an entire bale of straw."  (ML 0148) (emphasis in original).

Zyprexa and Cymbalta treatment.  (ML 0148)  Accordingly, Dr. Maris "maintain[s] that if Terry Riggs had not taken Zyprexa (and Cymbalta), then he would never have suicided."  (ML 0148).

Notwithstanding Ms. Riggs' submission of Dr. Maris' report, MetLife upheld its claim determination by way of correspondence dated April 20, 2011, and signed by a Senior Claim Examiner.  (ML 0164 - ML 0165)  The letter referenced Dr. Maris' conclusion that "if Terry Riggs had not taken Zyprexa (and Cymbalta), then he would never have suicide," however, the Senior Claim Examiner noted that Dr. Maris "does not suggest that these drugs were the only cause."  (ML 0165)  The Senior Claim Examiner quoted Dr. Maris' finding that "some of Terry's risk factors for suicide . . . were induced or made worse by psychiatric medication."  (ML 0165).

Further, the Senior Claim Examiner emphasized that "there is nothing in the report stating that Dr. Maris ever treated or examined Mr. Riggs prior to his death."  (ML 0165)  As such, the Senior Claim Examiner stated that Dr. Maris' opinions are "speculative" because he stated that he did not have access to Mr. Riggs' medical records and therefore did not know Mr. Riggs' medical diagnosis.  (ML 0165)  Accordingly, MetLife upheld the denial of the claim, finding that "[t]here is no dispute that Mr. Riggs shot himself resulting in his tragic death and that this occurred within 2 years of the date of the Optional Life insurance enrollment effective date of coverage."  (ML 0165).

On June 15, 2011, pursuant to ERISA, 29 U.S.C. § 1001 et. seq., Ms. Riggs filed a Complaint against MetLife, challenging its denial of Optional Life insurance benefits. [Dkt. 1]  She filed the present Motion for Summary Judgment on November 9, 2011 and

MetLife filed its Opposition and Cross-Motion for Summary Judgment on January 26, 2012.  [Dkts. 11, 15].

III.   **Standard**

a.  **ERISA Standard**

Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by establishing regulatory requirements for employee benefit plans and "by providing for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b); Aetna Health Inc. v. Davila, 542 U.S. 200, 208, 124 S. Ct. 2488, 2495, 159 L. Ed. 2d 312 (2004) (quoting same). Accordingly, under ERISA, a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

A Court typically reviews such actions under a *de novo* standard, unless the terms of the plan "give[ ] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989).  In cases in which the administrator or fiduciary has discretionary authority, the Court applies a "deferential standard of review."  Id. at 111.  The United States Court of Appeals for the Third Circuit has described this deferential review as an arbitrary and capricious standard, under which the District Court may "overturn a decision of the plan administrator only if it is without reason, unsupported by substantial evidence or

erroneous as a matter of law."[6]  Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (citing Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)).

Accordingly, the Third Circuit has recently noted that "[a]n administrator's interpretation is not arbitrary if it is reasonably consistent with unambiguous plan language"; however, "[w]hen a plan's language is ambiguous and the administrator is authorized to interpret it, courts must defer to this interpretation unless it is arbitrary or capricious." Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012) (internal citations omitted). "The determination of whether a term is ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations." Id. (citation omitted).

The Supreme Court of the United States has noted that when conducting the "deferential review" of a benefits denial made by an administrator or fiduciary invested with discretionary authority, the reviewing court must consider whether the plan administrator operated under a conflict of interest. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008). In this context, a conflict of interest exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." Id. at 112. Accordingly, the Glenn Court directed reviewing courts to consider this evaluator / payor conflict of interest as one of several different

---

[6] Though the Supreme Court described this deferential review as an "abuse of discretion" standard in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008), the Third Circuit has noted that in the ERISA context, the "arbitrary and capricious standard" and "abuse of discretion standard" are "practically identical." Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 526 n.2 (3d Cir. 2009).

considerations in determining whether there was an abuse of discretion.[7]  Id.  at 115-17.
The Court noted that "the significance of this factor will depend upon the circumstances
of the particular case."  Id.  at 108.

### b.  Summary Judgment Standard

Presently before the Court are the parties' Cross-Motions for Summary Judgment
pursuant to Fed. R. Civ. P. 56.  Under Federal Rule of Civil Procedure 56(c), a court shall
grant summary judgment if, viewing the facts most favorable to the non-moving party,
the moving party shows "that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp.,
247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Cleotex Corp. V. Catrett, 477 U.S. 317, 322
(1986)); Fed. R. Civ. P. 56(c).  An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the non-moving party's favor.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the
governing substantive law, a dispute about the fact might affect the outcome of the suit.
Id.  In determining whether a genuine issue of material fact exists, the court must view
the facts and all reasonable inferences drawn from those facts in the light most favorable
to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  In deciding the merits of a
party's motion for summary judgment, the court's role is not to evaluate the evidence

---

[7] The Court declined to create special rules focused on the evaluator/payor conflict, noting that
"[b]enefits decisions arise in too many contexts, concern too many circumstances, and can relate
in too many different ways to conflicts . . . for us to come up with a one-size-fits-all procedural
system that is likely to promote fair and accurate review."  Glenn, 544 U.S. at 116.

and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.

In cases such as this, where cross-motions for summary judgment are pending, "[t]he Court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus <u>Federal Practice and Procedure</u> § 2720 (3d ed.); <u>Marciniak v. Prudential Financial Ins. Co. of Am.</u>, 184 Fed. Appx. 266, 270 (3d Cir. 2006) (citing same).[8] Accordingly, in an ERISA case such as this, where the Plaintiff challenges a denial of benefits under an insurance plan that confers discretionary authority upon the plan administrator, the Court's "task is relatively straightforward, as the question presented by both motions is whether or not, based on the undisputed administrative record, [Defendant's] decision was an abuse of discretion."  <u>Kao v. Aetna Life Ins. Co.</u>, 647 F.Supp.2d 397, 409 (D.N.J. 2009).  As previously discussed, the Court's "abuse of discretion," or "arbitrary and capricious," inquiry must consider as one factor the inherent conflict of interest created when the plan administrator both evaluates and pays the benefits claims, as is the case in the matter before the Court.[9]  <u>See</u> <u>Glenn</u>, 554 U.S. at 108.  <u>See also, e.g.</u>, <u>Malin v. Metropolitan Life Ins. Co. v. Glenn</u>, 854 F. Supp.2d 606, 612 (D.Del. 2012) (Simandle, J.).

---

[8] <u>See also</u> <u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.").

[9] Here, the Plan confers discretionary authority on MetLife to interpret the terms of the plan, determine eligibility for Plan benefits, and determine entitlement to Plan benefits.  (ML 0057).

**IV.   The Parties' Cross-Motions for Summary Judgment**

    **a.  Plaintiff's Motion for Summary Judgment**

Plaintiff Argia Riggs argues that the Court should grant summary judgment in her favor because Defendant MetLife's denial of plaintiff's claim for Optional Life Insurance Benefits was arbitrary and capricious because "the determination is unreasonable and unsupported by substantial evidence." (Pl.'s Mot. 9) She argues that MetLife's denial of benefits was arbitrary and capricious because: (1) MetLife failed to conduct an adequate review of Plaintiff's claim, as MetLife only performed a "cursory review" of the suicide expert's report; and (2) she has provided substantial evidence, and has therefore met her burden of proving that she is entitled to benefits under the Plan.[10] (Pl.'s Mot. 9) Specifically, Ms. Riggs argues that she provided sufficient evidence of entitlement to benefits, as Dr. Maris' report indicates that Mr. Riggs' death does not meet the definition of "suicide"; rather, his death resulted from command hallucinations brought about by his ingestion of prescription medication and she points out that MetLife failed to provide any expert opinion to rebut Dr. Maris' report. (Pl.'s Mot. 13).

Ms. Riggs contends that MetLife failed to adequately review her claim because the administrative review of Dr. Maris' fifteen-page report "is addressed by three terse sentences" and because MetLife's denial letter "fails . . . to address the substance of Dr. Maris' report." (Pl.'s Mot. 10) She argues that MetLife "ignored Dr. Maris' discussion of the 15 suicide factors and the application of those factors to Mr. Riggs' situation." (Pl.'s Mot. 10) She also argues that MetLife's review was "cursory" because the administrative

---

[10] The parties agree that Ms. Riggs has the burden of demonstrating her entitlement to benefits. (Pl.'s Mot. 13; Def.'s Mot. 10); <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 439 (3d Cir. 1997) (explaining that "a claimant bears the burden of demonstrating that he qualifies for benefits").

record does not indicate that MetLife consulted with a professional in the medical or pharmaceutical field, consulted with any authoritative texts, or interviewed her regarding the facts surrounding Mr. Riggs' death.  (Pl.'s Mot. 12).

Further, she challenges MetLife's denial letter, which concludes that Dr. Maris' report is "speculative" because Dr. Maris did not consult Mr.Riggs' medical records and had no personal knowledge of Mr. Riggs.  (Pl.'s Mot. 10)  Here, Ms. Riggs argues that Mr. Riggs' medical diagnosis "was not an integral factor in Dr. Maris's analysis" and "[i]t goes without saying that Dr. Maris would have notified counsel if he was unable to provide an opinion without Mr. Riggs' medical records."  (Pl.'s Mot. 10)  Ms. Riggs notes that legal cases often include medical opinions from professionals who have not examined the subject; moreover, here, because this matter involves suicide, it is unlikely that Dr. Maris would have ever treated or examined Mr. Riggs in advance of his death.  (Pl.'s Mot. 10).

Ms. Riggs also contends that the Court should find MetLife's decision to be unreasonable under the arbitrary and capricious standard based on the conflict of interest in this case, and should not be persuaded by MetLife's attempt to downplay the conflict of interest.  (Pl.'s Opp'n. 2)  Specifically, MetLife submitted an affidavit from a Senior Claim Examiner stating that "MetLife employees who make decisions regarding claims seeking benefits under the ERISA plans are paid salaries which are wholly unrelated to the number of claims paid or denied."  (Hatzinger Aff.)  According to the affidavit, MetLife does not establish numerical guidelines or quotas regarding claim payments or denials and evaluates employees, in part, on the quality of their claim decisions.  (Hatzinger Aff.)  Ms. Riggs points out that while "there is no financial

14

incentive for employees to deny claims, clearly there is financial incentive to the company when monies are paid out."  (Pl.'s Opp'n. 2).

### b.  Defendant's Cross-Motion for Summary Judgment

MetLife has moved the Court to grant summary judgment in its favor because Ms. Riggs is unable to establish that she is eligible for benefits under the plan or show that the claim determination was arbitrary and capricious.  MetLife contends that the claim determination should be upheld because it is in accordance with the "clear and unambiguous terms" of the Plan and it is undisputed that the Certificate of Death states that Mr. Riggs' manner of death was suicide within two years from the effective date of his optional life insurance.  MetLife concludes that the that the Plan "unambiguously" states that benefits will not be paid "if You commit suicide within two years from the date Life Insurance . . . takes effect."  (Def.'s Mot. 11).

MetLife also contends that it is reasonable to rely on government documents, such as a death certificate, and it is not required to independently investigate Mr. Riggs' death or why he committed suicide.  (Def.'s Mot. 11-12)  Accordingly, MetLife argues that "it was not unreasonable for MetLife to give more weight to the government's reports – reports prepared by a disinterested third party – than to Dr. Maris' report."  (Def.'s Mot. 13)  Here, the claim determination documents indicate that MetLife "thoroughly considered" Dr. Maris' report and the report did not alter the claim determination. (Def.'s Mot. 12 n. 3).

## V.    Analysis

This case is before the Court as a result of the troubling and unfortunate circumstances surrounding Mr. Riggs' death, and the concern over the meaning and application of the suicide exclusion provision in Mr. Riggs' insurance policy.[11]  In particular, the question to be answered concerns whether ambiguity surrounds the meaning and application of the term "suicide."  Accordingly, the Court asked the parties to brief the meaning of "suicide," in order to have the parties' understanding of the term before the Court embarked on an analysis of whether the administrator's application of the "suicide" exclusion provision of the Plan was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  See Doroshow, 574 F.3d at 234.

Ms. Riggs' submissions provide that "suicide" is "the intentional killing of oneself."[12] (Pl.'s Br. 2)  She emphasizes that the intent requirement in the definition of "suicide" is of "foremost importance" and directs the Court to Dr. Maris' report, among other sources, which indicates that "to be classified and certified as a 'suicide' requires both the intent and motivation to suicide."  (Pl.'s Br. 6) (citing ML 0138)  Thus, a death is not

---

[11] The policy reads:

Suicide

If You commit suicide within 2 years from the date Life Insurance for You takes effect We will not pay such insurance and Our liability will be limited as follows:

• any premium paid by You will be returned to the Beneficiary; and

• any premium paid by the Policyholder will be returned to the Policyholder

(ML 0091).

[12] Ms. Riggs cites the Oxford English Dictionary, Second Edition, to argue that suicide is "the intentional killing of oneself."  She also cites an article in the Federation of Defense and Corporate Counsel's quarterly publication, which defines suicide as "the willful and voluntary act of a person who understands the physical nature of the act, and intends by it to accomplish self-destruction; [thus,] 'suicide' does not include self-destruction by an insane person."  Edgar Sentell, Suicide and the Life Insurance Death Claim, FDCC Quarterly 369 (Spring 2008).

a "suicide" if the decedent was unable to form the requisite suicidal intent, for example because of an insane impulse or command hallucination, even if the decedent physically caused his or her own death.  Accordingly, in the insurance context,

> [b]y the general rule, a simple suicide exception clause does not apply to exclude coverage when the insured intentionally kills himself or herself when his or her reasoning faculties are so far impaired by insanity that he or she is unable to understand the moral character of his or her act, even if he or she understands its physical nature, consequences, and effect, as such an act is not 'suicide,' or 'self destruction,' or 'dying by his or her own hand,' within the meaning of those words, or words of like character and construction excepting such risks out of the policy.

9A Couch on Ins. § 138:35.

Many insurers write insurance policies so that the policy is void if the insured dies by suicide "whether sane or insane" because they acknowledge the intent component of "suicide" and the tension created when an individual is overtaken by an "insane impulse" and is therefore unable to form the requisite intent to suicide.[13]   (Pl.'s Br. 2) In these circumstances, the "sane or insane" provision "extends the suicide clause "so as

---

[13] Ms. Riggs notes a split of authority over the construction of a "sane or insane" provision. Specifically, to invoke the "sane or insane" exclusion, the majority approach does not look to "the insured's consciousness or realization of the physical nature of consequences of his or her own act" and therefore it becomes irrelevant "whether the insured was under the influence of drugs and alcohol at the time or his or her death."  9A Couch on Ins. § 138:38.  In contrast, the minority view dictates that "consciousness of the physical nature and consequences of the act and an intention to kill oneself are essential" to invoke the 'suicide, sane or insane' exclusion. Id.  See also Southern Farm Bureau Life Ins. Co. v. Dettle, 707 S.W.2d 271, 274 (Tx. App. Ct. 1986) (noting that the "majority view accepts a broad popular definition of the term as covering any act of self destruction.  The minority view is essentially a criminal law or technical concept in that understanding and intent are deemed essential elements of a suicide.").  Here, however, the insurance policy does not include a "sane or insane" clause; to this end, the Court notes that this case may not have unfolded as it did had the insurer included a "sane or insane" clause in its policy.  See, e.g., Eastabrook v. Union Mut. Life Ins. Co., 54 Me. 224, 227-28 (1866) ("If they, the insurers, intended the exception to extend both to the case of felonious self-destruction and self-destruction not felonious, they ought . . . so to have expressed it clearly in the policy.") (internal quotation omitted).

to include intentional self-destruction by an insane as well as by a sane person . . ..”  9A Couch on Ins. § 138:37.  Ms. Riggs argues that absent such a provision, “insane suicide” is a covered loss.[14]  (Pl.'s Br. 3)  The Plan at issue does not include a “sane or insane” clause; accordingly, Ms. Riggs argues that her husband's death is a covered loss under the Plan, as he was “induced to end his life by a compulsion generated by [an] outside force, namely a drug with a now recognize[ed] effect of inducing suicidal thoughts” and this “compulsion to end his life came from an external force, not from an internal intent to leave this world for the next.”  (Pl.'s Br. 8).

While the Court is aware of its limited role in reviewing this case, it cannot ignore the troubling and unfortunate circumstances that bring this case before the Court.  Further, the Court acknowledges the argument, advanced by Plaintiff in her written submissions and during oral argument that, in essence, the facts of this case do not fall into the realm of circumstances contemplated by insurance companies when writing a suicide exclusion clause such as the one at issue in this case.  Specifically, she notes that insurers often include suicide clauses in insurance policies so as to prevent an individual from purchasing an insurance policy knowing that recovery is imminent because the

---

[14] Ms. Riggs directs the Court to several cases to show that courts have historically found that absent a “sane or insane” provision, “insane suicide” is a covered loss.  See, e.g. Waters v. Connecticut Mut. Life Ins. Co., 2 F. 892, 893 (C.C.D.N.J. 1880) (finding that “a man does not die by his own hand unless he commits the act which results in death with a knowledge at the time of its moral character, and its consequence and effects.  Nor does he die by his own hand if he is impelled to the act by an insane impulse which he has not the power to resist.”); Accident Ins. Co. of North America v. Crandal, 120 U.S. 527, 531, 7 S. Ct. 685, 687, 30 L. Ed. 740 (1887) (noting that “This Court . . . has repeatedly and uniformly held that such a provision, not containing the words ‘sane or insane,’ does not include a self-killing by an insane person, whether his unsoundness of mind is such as to prevent him from understanding the physical nature and consequences of his act, or only such as to prevent him, while foreseeing and premeditating its physical consequences, from understanding its moral nature and aspect.); Eastabrook, 54 Me. at 227-28 (“Death by disease is provided for by the policy. Insanity is a disease. Death the result of insanity, is death by disease. The insane suicide no more dies by his own hand than the suicide by mistake or accident . . ..”) (internal quotations omitted).

insured plans to end his or her life. [15]  (Pl.'s Br. 2)  She points out that this purpose of the suicide exclusion clause does not seem to apply to the tragic facts surrounding Mr. Riggs' death.

Dr. Maris opined that Mr. Riggs shot himself in response to command hallucinations caused by ingestion of a prescribed dosage of Zyprexa and Cymbalta, which have been increasingly linked to suicidal behavior.[16]  Here, the administrative record indicates that Mr. Riggs did not have suicidal ideations prior to taking the prescription medication at issue in this case.  Rather, he seemingly sought to improve his mental health by seeking psychological treatment and starting a prescribed dosage of Zyprexa and Cymbalta. However, shortly after starting this medication, he tragically ended his life by shooting himself.

---

[15]  As one treatise notes, "[t]he life insurer's primary concern in limiting the risk is generally to avoid payment when the insured does something to increase the risk beyond what the insurer took into account in deciding to issue the policy at a particular premium rate.  As a result, most life insurance policies exclude coverage for death which occurs by the insured's own hand . . .." 9A Couch on Ins. § 138:1.

[16] Dr. Maris' report indicates that "it is well-known that antipsychotics (like Zyprexa and Abilify) and antidepressants (like Cymbalta and Zoloft) have side-effects that are associated with increased suicidality."  (ML 0140)  Dr. Maris explained that patients ingesting medications such as Zyprexa and Cymbalta induce suicidogenic factors such as ego-dystonia, which makes patients feel "profoundly uncomfortable, depersonalized, and . . . very unpleasant" and "the patient just wants these unusual, alien feelings to go away and will do anything to stop them." (ML 0141)  Dr. Maris' report references studies showing that psychiatric medications may induce or exacerbate suicidal tendencies, including his work as a consultant to Columbia University and the Federal Drug Administration in one study that concluded "that up to age 24 antidepressants doubled the risk of suicide."  (ML 0140)  Dr. Maris also cited the "pdr.net" (Physicians' Desk Reference for Drugs), under the antidepressant "Paxil/paroxetine," which provides:

> The following symptoms, anxiety agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania and mania, have been reported in adult and pediatric populations being treated with anti-depressants . . . there is concern that such symptoms may represent precursors to emerging suicidality.

(ML 0140) (Emphasis in Dr. Maris' report).

Following her husband's death, Ms. Riggs applied for life insurance coverage under the Plan; however, MetLife denied her claim under the terms of the two-year suicide exclusion provision of the Plan because Mr. Riggs' death occurred within two years from the date on which the Plan took effect.  His death occurred sixteen days shy of the two-year suicide exclusion; had Mr. Riggs acted sixteen days later, his death would have been covered by the Plan and Ms. Riggs would have received life insurance benefits.

Additionally, Plaintiff's arguments regarding the history of Mr. Riggs' life insurance policy and his tenure with the company further demonstrate that the circumstances of Mr. Riggs' death do not fall within the policy concerns that motivate insurers to write a suicide exclusion clause into a life insurance plan.  Here, Mr. Riggs began working at the company in the late 1980s and Mr. Riggs subscribed to a life insurance policy throughout his twenty-five years of employment with this company.  The company changed ownership several times throughout Mr. Riggs' employment and the company's insurance policy also changed or was renewed several times throughout this time period.  Here, the policy at issue, and the two-year suicide exclusion clause contained therein, took effect in April 2008, after NuStar purchased the company in approximately March 2008.  Accordingly, the Court recognizes the troubling facts in this case:  Mr. Riggs subscribed to a life insurance policy throughout his tenure with a company that underwent several ownership and life insurance policy changes, including an April 2008 policy change that occurred after Mr. Riggs had worked for the company for over twenty years; this new 2008 policy included a two-year suicide exclusion provision; and Mr. Riggs' death, which Dr. Maris opines occurred in response to

hallucinations caused by his prescription medication, occurred in March of 2008 – only sixteen days shy of the expiration of the two-year exclusion.

While the Court acknowledges that these tragic circumstances do not place Mr. Riggs in the class of individuals that the suicide exclusion is intended to reach, here, "[t]he scope of this review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Doroshow, 574 F.3d at 234 (internal citation omitted).  The ERISA framework contemplates a highly deferential review of the claim administrator's denial of benefits. Accordingly, while the court finds that the term "suicide" is ambiguous, particularly in light of the issues presented by the facts of this case, the ERISA framework dictates that because the claim administrator is authorized to interpret the language of the Plan, the Court must defer to the plan administrator's interpretation unless it is unreasonable. See, e.g., Fleisher, 679 F.3d at 121; see also Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 385-86 (3d Cir. 2003), cert. denied 541 U.S. 1063, 124 S.Ct. 2390, 158 L.Ed.2d 963 (2004) (noting that "if the meaning of [the term] is ambiguous, [the insurer's] definition is entitled to deference under the applicable arbitrary and capricious standard of review"; yet, the insurer's "definition of the term nonetheless must be reasonable before deference is conferred").

Here, the Plan does not define "suicide," and does not include a "sane or insane" clause that would shed light on the meaning of the term as used in the Plan.  Ms. Riggs' arguments illustrate one reasonable interpretation of "suicide" as used in the Plan: namely, a "suicide" requires that the decedent possess the requisite intent and motivation to suicide.  In contrast, MetLife does not offer a definitive definition of

"suicide," but emphasizes the requisite physical act of self-destruction and that based on the facts of this case, "it is reasonable to conclude that an individual's death, resulting from a self-inflicted gunshot wound to the head, is a suicide."[17] (Def.'s Letter)  Here, the standard is reasonableness.  The Court finds that MetLife's interpretation of "suicide" is not unreasonable.  As a result, the Court must defer to MetLife's interpretation.

Further, even if the Court reached a different conclusion under a *de novo* review, it recognizes that it is constricted by the standard of review imposed by ERISA, and as such must conclude that MetLife's review of the denial of benefits was not arbitrary or capricious.  Here, the Court cannot conclude MetLife's denial of benefits to Ms. Riggs was "without reason, unsupported by substantial evidence or erroneous as a matter of law" to warrant overturning the claim administrator's decision.  Doroshow v. Hartford Life & Acc. Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (citing Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)).  Rather, MetLife's denial letter explains that the claim administrator considered the death certificate issued by the State of New

---

[17] Rather than attempting a definition of "suicide," MetLife's supplemental submission emphasizes the Court's limited role in this case:  determining whether the claim administrator's decision was arbitrary and capricious.  MetLife first argues that its claim determination should be "upheld because it was in accordance with the clear and unambiguous language of the Plan." (Def.'s Letter)  Further, even if "suicide," as used in the Plan, is ambiguous, the Court should uphold MetLife's decision because its interpretation of "suicide" was reasonable and neither arbitrary nor capricious.  (Def.'s Letter)  Notably, MetLife directs the Court to Malin v. Metropolitan Life Ins. Co, 845 F.Supp. 2d 606 (D.Del. 2012) (Simandle, J.), and quotes the definitions of "suicide" used by the Court in that case.  (Def.'s Letter) (citing Malin, 845 F.Supp.2d at 613-14)  Specifically, the Malin Court noted that "[s]uicide has traditionally and consistently been defined as 'deliberately put[ting] an end to [one's] own existence, or commit[ting] any unlawful malicious act, the consequence of which is his own death.'"  Malin, 845 F.Supp.2d at 613-14 (quoting Cruzan v. Director, Missouri Dept. Of Health, 497 U.S. 261, 294, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (Scalia, concurring) (quoting 4 W. Blackstone, Commentaries 189)).  The Malin Court also cited two dictionary definitions of "suicide."  Id.  at 614 n.5 (citing Websters New World College Dictionary ("the act of killing oneself intentionally"); Cambridge Dictionary of American English ("the act of killing yourself intentionally")).  However, MetLife does not explicitly define "suicide"; rather, throughout its submissions, MetLife emphasizes the physical cause of death in this case, namely a self-inflicted gunshot wound, and the reasonableness of the conclusion that this act constitutes a "suicide."

Jersey as well as Dr. Maris' report.[18]  The denial letter quotes Dr. Maris' conclusion that "Zyprexa and Cymbalta were substantial, major contributing factors or proximate causes of Terry Riggs' suicide" and that Mr. Riggs was incapable of forming the requisite suicidal intent.  The claim administrator points out, however, that Dr. Maris did not conclude that the drugs were the only cause of Mr. Riggs' death and concludes that Dr. Maris' report is speculative.  Accordingly, MetLife's denial letter explains the claim examiner's finding that Mr. Riggs committed "suicide" within two years of the date that his life insurance policy took effect, and therefore denied the benefits claim under the terms of the Plan.  As stated earlier, even if the Court could have reached a different conclusion regarding the weight of Dr. Maris' report in light of the facts of this case, it cannot conclude that the claim administrator's determination was arbitrary or capricious.

Finally, the Court has considered the inherent conflict of interest in the evaluator / payor system as a factor in its review of this case under the arbitrary and capricious standard.  See Glenn, 554 U.S. at 108, 115-17.  However, the Court finds that this conflict, viewed in light of the administrative record before the Court, including the facts underlying Mr. Riggs' death and the claim examiner's reasoning for MetLife's denial of benefits as set forth in the denial letter, does not warrant a reversal of the claim administrator's determination in this case.

---

[18] As Plaintiff argues, suicide is a complex phenomenon and "[t]he death certificate speaks to the physical cause of death" and does not speak to "all the elements and factors involved in the context of suicide."  (Pl.'s Opp'n. 5-6)  Specifically, a notation of "suicide" on the death certificate may not reflect the decedent's intent, which is an integral component to the decedent's death being understood as a "suicide."  Perhaps the Court would have reached a different conclusion had the claim administrator relied solely on the medical examiner's notation.  However, this question is not before the Court, as the record before the Court indicates that the claim administrator's analysis included both the medical examiner's observations, as noted on the Certificate of Death, as well as Dr. Maris' report.

## VI.    Conclusion

For the reasons discussed above, the Court will deny Plaintiff's Motion for Summary Judgment [Dkt. 11] and grant Defendant's Motion for Summary Judgment [Dkt. 15]. The appropriate order shall issue.

Dated: April 18, 2013

   _/s/ *Joseph H. Rodriguez*_____

   HON. JOSEPH H. RODRIGUEZ,
   United States District Judge